

## In The
## Court of Appeals
## Sixth Appellate District of Texas at Texarkana

_____

No. 06-09-00005-CR

_____

EARNEST DWAIN MORALES, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 8th Judicial District Court
Delta County, Texas
Trial Court No. 6954

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss

O P I N I O N

The sister of Earnest Dwain Morales had been arrested earlier in the day by Sergeant Paul David Robertson of the Delta County Sheriff's Department. So, when Morales found Robertson and fellow officer Josh Richardson at a convenience store in Cooper, Texas, he approached them in the parking lot to discuss the arrest. A struggle ensued. As a result, Robertson had scraped knees and pepper spray in his eyes and upper respiratory system. Morales was convicted of assault on a public servant and sentenced to three years' confinement and fined $10,000.00.

On appeal, Morales contends that the evidence was legally and factually insufficient to support the verdict and that the trial court erred by admitting evidence of his prior arrests.

We affirm the judgment of the trial court because (1) legally and factually sufficient evidence supports the jury's finding that Morales recklessly caused Robertson bodily injury, and (2) the trial court did not abuse its discretion by admitting evidence of Morales' prior violent offenses.

*(1) Legally and Factually Sufficient Evidence Supports the Jury's Finding that Morales Recklessly Caused Robertson Bodily Injury*

Morales challenges the legal and factual sufficiency of the evidence that he intentionally, knowingly, or recklessly caused bodily injury to Robertson.[1]

---

[1]Morales' second and third points of error challenge, respectively, the factual and legal sufficiency of the evidence to support a finding that he caused bodily injury to Robertson. His fourth point asserts a claim for "fatal variance," however, it merely restates his evidentiary sufficiency challenge and fails to cite any supporting law. We analyze Morales' fourth point of error as a legal sufficiency challenge; and, to the extent he seeks to make a fatal variance claim, we overrule it as inadequately briefed. *See* TEX. R. APP. P. 38.1(i).

2

In reviewing the legal sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 320 (1979); *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). In a factual sufficiency review, we review all the evidence, but do so in a neutral light and determine whether the evidence supporting the verdict is so weak or is so outweighed by the great weight and preponderance of the evidence that the jury's verdict is clearly wrong or manifestly unjust. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008); *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007); *Watson v. State*, 204 S.W.3d 404, 414–15 (Tex. Crim. App. 2006). We must afford "due deference" to the fact-finder's determinations. *Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006); *see Young v. State*, 242 S.W.3d 192, 198 (Tex. App.—Tyler 2007, no pet.). And although, when we review the factual sufficiency of the evidence, we have the ability to second-guess the fact-finder to a limited degree, we should nonetheless be deferential, with a high level of skepticism about the fact-finder's verdict required before a reversal can occur. *Roberts*, 220 S.W.3d at 524; *Young*, 242 S.W.3d at 198–99.

The elements of assault on a public servant are that a person (1) intentionally, knowingly, or recklessly, (2) causes bodily injury, (3) to a person, (4) whom the actor knows to be a public servant, and (5) that public servant is discharging an official duty. TEX. PENAL CODE ANN. § 22.01(a)(1),

3

(b)(1) (Vernon Supp. 2008). We use a hypothetically correct jury charge to evaluate both the legal and factual sufficiency of the evidence.[2] *Grotti v. State*, 273 S.W.3d 273 (Tex. Crim. App. 2008).

Morales challenges the evidentiary sufficiency only with respect to the elements that he caused bodily injury to Robertson and that he was at least reckless when he did so. Because evidentiary sufficiency is questioned, we set out, here, more of the salient facts before our analysis of the issues.

Robertson and Richardson had their patrol car parked at a convenience store. Robertson testified that, while he was standing next to the patrol car, Morales, very sweaty and visibly angry, quickly approached him and began yelling and shaking his finger in Robertson's face regarding his arrest of Morales' sister earlier in the day. Morales "had a wild look in his eye" and claimed ownership of an illegal knife found during his sister's arrest. Intending to pat Morales down for weapons, Robertson repeatedly ordered Morales to place his hands on the car, but Morales refused to comply. Robertson testified to the altercation that followed and, as an integral part of his testimony, physically demonstrated the altercation for the jury with another officer. The demonstration was not (and could not be) transcribed fully; but the jury viewed it and necessarily derived information from the testimony and demonstration beyond what it would have derived from the testimony alone. There was no objection to the demonstration, and no effort was made to assure that the record reflected the details placed before the jury by the demonstration.

---

[2]We find the trial court's charge to the jury to have been in substantial if not complete compliance with the applicable law, and thus, the equivalent of a hypothetically correct charge.

4

Robertson testified that, when he grabbed for Morales' arm, intending to restrain Morales in order to search him, Morales jerked away, lowered his head and "came down into my waist here (indicating)," "ducked his head down," and "went toward [Robertson's] right side," "in the middle of" Robertson, with his arms around Robertson—apparently meaning that Morales physically stepped into Robertson and caused his arms to envelop Robertson. In response, as Morales was doing that, Robertson then caused the two struggling men to fall to the ground, again movements that were physically demonstrated to the jury. Robertson repeatedly ordered Morales to put his hands behind his back. During this time, Morales resisted the officers, at one point locking his hands under his body so the officers could not cuff him and at another point reaching for Robertson's gun (still holstered). When Richardson sprayed Morales with pepper spray, at Robertson's request, it also affected Robertson, who was still on the ground holding Morales. Later, apparently as something of a summary of the physical demonstration to the jury, Robertson testified that Morales "attacked" him and "charged into" him.

The officers cuffed Morales and put him in the patrol car. Robertson testified that his "knees were scraped up from having to be on the ground," his right eye was temporarily blinded by the pepper spray, and his breathing was affected by the pepper spray.

On cross-examination, Robertson admitted that, in response to Morales' actions, he, rather than Morales, pulled or wrestled the two of them to the ground. He also agreed that Morales did not verbally threaten him, that the natural response of a person put in a painful position was to try to get

5

out of it as quickly as possible and that Morales was trying to free himself from Robertson's hold and to get away.

Richardson testified that he was in the passenger seat of the patrol car with the passenger door and window shut when Morales approached Robertson. Morales looked "aggravated," had his fists "balled up," "and was yelling at Robertson, asking if the officers had arrested Morales' sister earlier that night. Richardson heard Robertson ask Morales to put his hands on the car "two or three times, and then they were on the ground." Richardson jumped out of the patrol car and ran to the driver's side where Morales was on his knees, with Robertson leaned over him, grabbing at Morales' upper body. Both officers repeatedly ordered Morales to put his hands behind his back, but Morales resisted their efforts to cuff him by locking his hands together under him. On order from Robertson, Richardson sprayed Morales with pepper spray, which got on Morales, Robertson, and Richardson, causing Richardson's skin to burn. After spraying Morales, they cuffed him and put him in the squad car, despite his continuing efforts to resist.

Nicki Szafran, a first-grade teacher, was sitting in the front passenger seat of her daughter's car, which was parked on the right side of the patrol car at the convenience store, when she saw Morales walk up to the patrol car. She saw Morales have a "heated . . . discussion" with one of the deputies. She said Morales looked angry, seemed upset, and may have been "pointing at [the deputy]." During the scuffle between Robertson and Morales, she heard the officers repeatedly tell Morales to "[c]alm down" and "put [his] hands behind [his] back," but Morales "kept fighting it" by

6

"trying to break away" and "get loose" from Robertson. On direct examination, Szafran conceded that she did not see Morales "running or hitting or anything," and on cross-examination, she admitted that she "couldn't tell what was going on" once Robertson took Morales to the ground, because the police car blocked her view.

After the State rested, Susan Childress, Morales' girlfriend and mother of his child, testified as a defense witness. Childress saw Morales calmly approach Robertson and ask to speak with him about Morales' sister. Robertson told Morales to come closer so Robertson could search Morales. She said Morales complied with Robertson's commands, but when Morales asked why the search was necessary, Childress saw Robertson slam Morales' head against the patrol car and search him. Then, she saw Robertson grab Morales around the throat and take him to the ground. Morales tried to get Robertson's arm off of his throat. She testified that she had a clear, unobstructed view of the events and that Morales never threatened, swung at, or otherwise attempted to assault the officers.

On cross-examination, Childress asserted that Morales was innocent and denied that he charged into Robertson. She did not hear the officers order Morales to calm down or put his hands behind his back. She admitted that Morales provided financial support for her and their baby and conceded that, if Morales were convicted, it would cause her great financial harm.

Next, Morales' father, Peter Mark Morales (Peter), testified that he was at the convenience store putting gas in his truck when he saw Morales approach Robertson. Peter saw Morales ask Robertson something, and Robertson started pushing Morales, shoved his head against the patrol car,

7

quickly put him in a choke hold and pulled him to the ground. Before the officers restrained Morales, Peter did not see Morales take any violent action toward the officers. He thought Morales struggled with the officers as a reaction to the choke hold. Peter said Morales offered no resistance of any kind until Robertson took Morales to the ground.

Morales took the stand in his own defense and testified that he followed the officer's instructions and denied doing anything to injure Robertson. When asking Robertson about his sister's arrest, Morales described his own demeanor as docile and respectful. Morales asserts that Robertson put him in a choke hold and pulled him to the ground. After he and Robertson went to the ground, Morales testified that, in order to avoid injury, he went into defensive mode, a fetal position, bent over on his knees with his hands clasped together under him. Morales admitted that, in trying to relieve the pressure on his neck and stop Robertson's choke hold, he may have grabbed Robertson's hands, tried to remove them from around his neck, or reached around Robertson's body and tried to push him off. He denied making any aggressive moves toward Robertson.

Here, Morales contends there was no evidence that he knowingly, intentionally, or recklessly caused bodily injury to Robertson because the officer wrestled Morales to the ground and ordered the use of pepper spray. Because the pain from both events was the direct result of Robertson's actions or orders, Morales argues, any pain from the pepper spray or scraped knees was caused by Robertson rather than Morales. We disagree.

> A person is criminally responsible if the result would not have occurred but for his
> conduct, operating either alone or concurrently with another cause, unless the

8

> concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.

TEX. PENAL CODE ANN. § 6.04(a) (Vernon 2003).

"Bodily injury" is defined as "physical pain, illness, or any impairment of physical condition." TEX. PENAL CODE ANN. § 1.07(a)(8) (Vernon Supp. 2008). This "purposefully broad" definition of "bodily injury" includes physical pain from "even relatively minor physical contacts so long as they constitute more than mere offensive touching." *Wawrykow v. State*, 866 S.W.2d 87, 89 (Tex. App.—Beaumont 1993, pet. ref'd) (citing *Lane v. State*, 763 S.W.2d 785, 786 (Tex. Crim. App. 1989)). The intent element, "reckless," is defined in Section 6.03(c) of the Texas Penal Code:

> A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

TEX. PENAL CODE ANN. § 6.03(c) (Vernon 2003). Jurors may also infer intent from the defendant's acts, words, and conduct. *Guevara v. State*, 152 S.W.3d 45, 49 & 50 (Tex. Crim. App. 2004); *see also Beltran v. State*, 593 S.W.2d 688, 689 (Tex. Crim. App. [Panel Op.] 1980); *Moyer v. State*, 948 S.W.2d 525, 530 (Tex. App.—Fort Worth 1997, pet. ref'd).

Morales focuses on Robertson's action in taking the pair to the ground and in ordering the use of pepper spray, suggesting that there is no proof of any affirmative action by Morales that caused any pain or injury to Robertson.

9

The broad statutory definition of assault does not explicitly require an exertion of force in the direction of the victim, but, by its terms, allows a conviction for even recklessly "causing" pain to another, without specifying any type of action required. Given this broad definition of assault, unless there is, within the meaning of the statute, some implicit added requirement—such as an action taken in the direction of an arresting officer—there appears the real possibility that, in some cases, it would be impossible to distinguish between resisting arrest and assaulting an officer who is attempting an arrest. Pulling away from an officer's grasp, or passively refusing to cooperate in an arrest, if pain results to the arresting officer, theoretically could support an assault conviction. On the other hand, we have found no published Texas case that has approved an assault conviction in the absence of some proof that the defendant struck the victim or used some force in the direction of the victim.

The Texas Court of Criminal Appeals has held that a defendant charged with assaulting an arresting officer was not entitled to a lesser-included offense instruction on resisting arrest when he or she struck the arresting officer, even though his or her motive was to avoid being arrested. *See Lofton v. State*, 45 S.W.3d 649 (Tex. Crim. App. 2001). At least one court has expressed concern over that holding:

> [W]e find the *Lofton* decision troubling: the *Lofton* holding creates the very great risk that, in any case in which a person resists arrest by any use of force, the State will oppose a resisting arrest instruction. Although the appellants in the instant case and in *Lofton* clearly used a great deal of force in resisting arrest, the decision of the court of criminal appeals raises the very real possibility that any minor scuffle during

10

an arrest will result in a defendant being charged solely with assault on a public servant.

*Oiler v. State*, 77 S.W.3d 849, 853–54 (Tex. App.—Corpus Christi 2002, pet. ref'd).

A few years ago, we upheld an assault conviction where a defendant's flailing struggles to avoid arrest resulted in the defendant hitting and kicking an officer. *Gumpert v. State*, 48 S.W.3d 450, 454–55 (Tex. App.—Texarkana 2001, pet. ref'd). Evidence that defendant struck the victim in the chest causing pain and scuffled with the victim resulting in injured fingers, has been held sufficient to support an assault conviction. *Bryant v. State*, 47 S.W.3d 80, 82–83 (Tex. App.—Waco 2001, pet. ref'd); *see Lofton*, 45 S.W.3d at 652 (even if defendant intended only to prevent his arrest, force used in striking officer in face was at least reckless in causing bodily injury); *Brooks v. State*, 967 S.W.2d 946, 947–48 (Tex. App.—Austin 1998, no pet.) (evidence sufficient where defendant accidently struck an officer in eye while "merely trying to free herself" from officer's grasp).

In each of the preceding cases, the public servant testified to a blow of some sort from the defendant or a forcible struggle with the defendant (not a simple pulling away), causing pain to the public servant. Morales argues that there is no proof that any action of his caused Robertson's pain. Here, we need not decide whether assault requires proof of some force used on or in the direction of the victim.

While there is no testimony of an actual hit or kick that connected with any part of Robertson's body, there is testimony by Robertson of a physical movement by Morales toward Robertson that connected with at least some portion of Robertson's midsection and, immediately

11

following that contact, an ensuing struggle, during which Robertson was "injured." Also, there was later testimony that Morales, after aggressively approaching Robertson, "attacked" or "charged into" Robertson. Those items of evidence are sufficient, without more, to show that Morales exerted force against or toward Robertson and that force is connected causally to Robertson's "injuries."

Also during Robertson's testimony, Robertson and a fellow officer gave the jury a physical demonstration of the encounter, thus putting before the jury certain evidence that we cannot see or explicitly read in the record. Physical demonstrations or gestures have been cited as added reasons appellate courts must defer to jury findings.

Central to one case was the fact question of where the defendant put his hand during the charged robbery. *See Rogers v. State*, 756 S.W.2d 332, 336–37 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd). The location of Rogers' hand was hinted at in the language used in testimony, but was apparently specified by the gestures of a witness and of both attorneys in questioning that witness. Notwithstanding the lack of explicit testimonial language specifying where Rogers' hand was located, the court in *Rogers* deferred to the jury verdict in light of the demonstrations or gestures made at trial:

> In addition to noting that appellant failed to request that the record reflect the substance of the gestures or demonstrations, we also note that he failed to object to them. Because this court must evaluate challenges to the sufficiency of the evidence by reviewing the record in the light most favorable to the verdict, we hold the testimony excerpted above, which indicates that not one but several demonstrations took place, supports the jury's verdict. *See* Tex. R. App. P. 50(d).

12

*Id.* at 337. Similarly, an earlier involuntary manslaughter case turned on how the defendant held a gun; in deference to the jury's findings, the appellate court found the evidence sufficient to support the conviction, because the jury had seen the physical gestures obviously accompanying indeterminate expressions "like that" or "like this" used in the testimony. *Gaona v. State*, 733 S.W.2d 611, 613 & n.1 (Tex. App.—Corpus Christi 1987, pet. ref'd). We, too, are constrained to defer to the jury's findings, based on its observation of the gestures and demonstrations at trial, gestures and demonstrations which were not transcribed and which we cannot see.

Even without such a physical demonstration for the jury, we use "deferential standards of review" in reviewing jury findings for evidentiary sufficiency. *Roberts v. State*, 221 S.W.3d 659, 664 n.7 (Tex. Crim. App. 2007); *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). The jury is in the better position to evaluate the witnesses. *Marshall*, 210 S.W.3d at 625. That is especially true when there were physical demonstrations or gestures given in the jury's presence, but that are not explicitly transcribed or detailed in the record. *See Rogers*, 756 S.W.2d at 336–37; *Gaona*, 733 S.W.2d at 613 & n.1.

There is testimonial evidence that Morales moved or charged into Robertson's body, making contact with him and that pain to Robertson (skinned knees and pepper spray) flowed directly from that contact. There was also the physical demonstration to the jury. The evidence, thus, allows for a finding that actions by Morales, in which he directed force toward Robertson, resulted directly in Robertson's "take-down" of Morales, the struggle on the ground, the skinned knees, and the pepper

spray.  Skinned knees and the results of the pepper spray constitute "bodily injury."[3]  As the record

---

[3]A jury may infer that a victim actually felt or suffered physical pain, because people of common intelligence understand pain and some of the natural causes of it.  *Randolph v. State*, 152 S.W.3d 764, 774 (Tex. App.—Dallas 2004, no pet.).  When considering whether evidence is sufficient to establish that a victim suffered pain, juries may use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life, using inferences that may reasonably be drawn from the evidence.  *Wawrykow*, 866 S.W.2d at 88–89.

Robertson testified to suffering only two injuries:

> Q      [By the State]  And what kind of pain did [the pepper spray] cause you?
>
> A       . . . you can't breathe, on a regular . . . it does takes your breath away. It feels like you're out of air. . . .
>
> Q       . . . you had the inability to breathe properly?
>
> A      Yeah.  And I was blinded for a little bit, too.
>
> Q      In both eyes or just one eye?
>
> A      Just, mainly, one.
>
>       . . . .
>
> Q      [By Defense Counsel]  Did [Morales] do anything to harm or injure you?
>
> A      Yes, sir.
>
> Q      What did [Morales] do to harm or injure you?
>
> A       Well, my knees were scraped up from having to be on the ground, on the concrete, and I got sprayed [with pepper spray] as a result of him resisting.

14

does not conflict with the jury findings, we find the evidence that Morales knowingly, intentionally, or recklessly caused bodily injury to Robertson legally and factually sufficient.

*(2)     The Trial Court Did Not Abuse Its Discretion by Admitting Evidence of Morales' Prior Violent Offenses*

Morales argues that the trial court erred in allowing questions about the prior arrests because the danger of unfair prejudice substantially outweighed the evidence's probative value.[4] We disagree.

On direct examination, the following exchange took place between Morales' counsel and Childress, a defense witness:

> Q      Did Mr. Morales threaten the officer in any way?
>
> A      No.
>
> Q      Did [Morales] use any abusive language towards the officer?
>
> A      No, he didn't. *He's not that type of person.*
>
> Q      Did he make any threatening gestures toward the officer?
>
> A      No.

(Emphasis added.) Outside the jury's presence, the State argued that by saying, "[h]e's not that type of person," Childress characterized Morales "as a peaceful person" and that her testimony opened the door to questions about "any violent offense." The State sought to rebut Childress' testimony and

---

[4]At trial, Morales preserved an objection under Rules 404(b) and 609 of the Texas Rules of Evidence; however, Morales does not cite, raise, or otherwise argue Rules 404(b) or 609 in his brief, so we do not address them here and must assume, for purposes of this review, that, under Rules 404(b) and 609, the evidence was fundamentally relevant for an admissible purpose other than conformity. TEX. R. EVID. 404(b), 609.

15

thereby "correct a false impression that's been put before the jury" by asking Childress if she knew about Morales' prior arrests for violent crimes, which stem from 1993 through 2005. Morales objected, asserting that the probative value of the extraneous-offense evidence was substantially outweighed by the danger of unfair prejudice. The trial court overruled Morales' objection[5] and allowed the State to ask Childress if she knew about Morales being arrested for:

Robbery in 1993;
Battery of a police officer and resisting arrest in 1994;
Obstructing a police officer in 1994;
Obstructing a police officer and domestic violence battery in 1998;
First-degree kidnapping in 2002;
Domestic violence in 2003;
Battery domestic violence in 2005; and
Another battery domestic violence in 2005.

**Standard of Review**

We review a trial court's admission or exclusion of extraneous-offense evidence for abuse of discretion. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). Moreover, a trial court's decision regarding admissibility of evidence will be sustained if correct on any theory of law applicable to the case, even when the court's underlying reason for the decision is wrong. *Romero v. State*, 800 S.W.2d 539, 543–44 (Tex. Crim. App. 1990).

If a trial court determines that evidence of extraneous crimes or bad acts have relevance aside from character conformity, and a timely, proper Rule 403 objection is made, the trial court must

---

[5]The trial court granted Morales a running objection to all questions about Morales' prior arrests.

16

make a balancing determination under Rule 403. *Montgomery v. State*, 810 S.W.2d 372, 388–89 (Tex. Crim. App. 1990) (op. on reh'g). Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403. Only "unfair" prejudice provides the basis for exclusion of relevant evidence. *Montgomery*, 810 S.W.2d at 389. Unfair prejudice arises from evidence that has an undue tendency to suggest that a decision be made on an improper basis, commonly an emotional one. *Id.* We do not conduct a de novo review of the record with a view to making a wholly independent judgment as to probative value versus prejudicial risk. *Id.* at 392. We reverse a trial court's determination under Rule 403 "rarely and only after a clear abuse of discretion," recognizing that the trial court is in a superior position to gauge the impact of the relevant evidence. *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999); *Jones v. State*, 119 S.W.3d 412, 421–22 (Tex. App.—Fort Worth 2003, no pet.).

The relevant criteria in determining whether the prejudice of an extraneous offense substantially outweighs its probative value include, but is not limited to: (1) the strength of the extraneous offense to make a fact of consequence more or less probable; (2) the potential the extraneous-offense evidence has to impress the jury in some irrational, but nevertheless indelible way; (3) the time needed to develop the evidence, during which the jury will be distracted from consideration of the indicted offense; and (4) the proponent's need for the evidence to prove a fact

17

of consequence. *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. 2005) (citing *Montgomery*, 810 S.W.2d at 392); *Mozon*, 991 S.W.2d at 847.

The first factor, probative value, weighs in favor of admission. The State claimed that Childress put the false impression before the jury that Morales was a peaceful person, and the State offered evidence of arrests for violent crimes to rebut that impression. The record shows Childress testified, at best, that Morales was not the type of person to make threats, use abusive language, or make threatening gestures toward an officer. The State mischaracterized the direct questions to Childress and the answers she gave. However, Morales failed to object to the mischaracterization or request an examination of the record for the specific questions and answers. The extraneous-arrest evidence was probative of both how well Childress knew Morales and the foundation for her characterization of Morales. Therefore, the prior arrests were probative to rebut the "false impression."

The second factor, the potential to give the jury an irrational impression, inquires as to the evidence's tendency to tempt the jury into finding guilt on grounds apart from proof of the offense charged. *Mechler*, 153 S.W.3d at 440. The prior arrests admitted into evidence included robbery, battery of a police officer, resisting arrest, and domestic violence. The arrests for robbery and battery of a police officer occurred more than a decade prior and are either identical or arguably worse than the offense with which Morales was currently charged. The potential prejudice of nearly identical acts is very high because it is stark proof of criminal character or propensity. *Parks v. State*, 746

18

S.W.2d 738, 739 (Tex. Crim. App. 1987). However, giving limiting instructions to the jury is a factor to consider in determining whether the jury improperly considered the extraneous-arrest evidence. *Owens v. State*, 827 S.W.2d 911, 916–17 (Tex. Crim. App. 1992). In this case, the trial court gave a limiting instruction to the jury, and although not as narrowly tailored to the specific issues involved as it could have been, the charge did seek to have the jury limit its use of the extraneous-offense evidence.[6] Therefore, we find that this factor weighs toward admission.

The third factor, the time spent developing evidence of the extraneous arrests, was not unduly lengthy. Childress' testimony regarding the extraneous arrests took up only about four pages in the 564-page record. Thus, this factor is neutral and favors neither exclusion nor admission. *Blackwell v. State*, 193 S.W.3d 1, 18 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

The fourth factor, the State's need for the extraneous-arrest evidence to prove a fact of consequence, weighs in favor of admission. The State sought to rebut Childress' characterization of Morales that he was "not that type of person" by showing that she did not know Morales that well or that long, i.e., "the foundation of her belief [was] . . . incomplete." The question of whether

---

[6]The following instruction was given to the jury and is not challenged on appeal:

> You are instructed that if there is any testimony before you in this case regarding the defendant having committed offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the intent, knowledge, design, and/or scheme of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment in this case, and for no other purpose.

19

Morales was threatening the officers is directly related to his intent, and the State did not have other evidence with which to rebut Childress' characterization of Morales' character. Therefore, the State had need for this evidence.

Considering all four factors together, we conclude that the probative value of the extraneous-arrest evidence was not substantially outweighed by its prejudicial impact. Consequently, we hold that the trial court properly overruled Morales' Rule 403 objection and overrule this point of error.

We affirm the judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:     July 30, 2009
Date Decided:       August 12, 2009

Publish